CUÉLLAR, J.,
Concurring and Dissenting.—Neither the federal nor the state Constitution bars the government from taking private property to further a legitimate public purpose, so long as the property owner receives just compensation. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19, subd. (a).) At issue in this case are the rules for calculating precisely what compensation is just.
Under California law, the proper measure of compensation when the government takes private property “is the fair market value of the property taken.” (Code Civ. Proc., § 1263.310.) The fair market value, in turn, reflects the price that an informed but disinterested buyer would negotiate with a similarly positioned seller on the date of valuation, each with full knowledge of the property’s highest and best use. (Id., § 1263.320, subd. (a); see City of San Diego v. Neumann (1993) 6 Cal.4th 738, 744 [25 Cal.Rptr.2d 480, 863 P.2d 725].) The knowledge imputed to the parties in this hypothetical negotiation consists of “ ‘all the facts which would naturally affect [the property’s] value’ ” and “ ‘ “which enter into the value of the land in the public and general estimation, and tend[] ... to influence the minds of sellers and buyers.” ’ ” (Merced Irrigation Dist. v. Woolstenhulme (1971) 4 Cal.3d 478, 493 [93 Cal.Rptr. 833, 483 P.2d 1], italics added (Woolstenhulme).) Crucially, this knowledge would encompass, as the majority readily acknowledges, “ ‘lawful legislative and administrative restrictions on property, which *607 a buyer would take into consideration in arriving at the fair market value.’ ” (Maj. opn., ante, at p. 599, quoting People ex rel. State Public Works Bd. v. Talleur (1978) 79 Cal.App.3d 690, 695-696 [145 Cal.Rptr. 150].) The jury—which, unless waived, is charged with determining the amount of compensation (Cal. Const., art. I, § 19)—may consider this information, along with all the other relevant facts governing permissible uses of the property. Allowing the jury to weigh such information helps ensure that the compensation awarded is “just to the public as well as to the landowner.” (Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp. (1997) 16 Cal.4th 694, 716 [66 Cal.Rptr.2d 630, 941 P.2d 809].)
The likelihood that some portion of the property could never be developed is one fact that would indisputably bear on permissible uses of any undeveloped property. For example, where a public agency lawfully demands that a landowner dedicate a portion of the property to the public as a legitimate condition for granting a permit to develop the remainder of the parcel, no compensation is due. (Maj. opn., ante, at p. 599; see Dolan v. City of Tigard (1994) 512 U.S. 374, 391 [129 L.Ed.2d 304, 114 S.Ct. 2309]; Nollan v. California Coastal Comm’n (1987) 483 U.S. 825, 836 [97 L.Ed.2d 677, 107 S.Ct. 3141] (Nollan).) The Fifth Amendment does not shield a landowner from responsibility to mitigate the burdens imposed on the public by a parcel’s development, and the mitigation undertaken by the public entity— e.g., roads, drainage, habitat preservation—often redounds to the benefit of the landowner as well as to the public generally. So long as there is an “essential nexus” (Nollan, at p. 837) and “ ‘rough proportionality’ ” (Dolan, at p. 391) between the required dedication and the projected impact of the development, the dedication results from a valid exercise of the public entity’s police power, not from a taking (Nollan, at p. 836).
In some situations, a landowner will not yet have sought to develop the property, but there is a reasonable probability that a public agency would lawfully condition any future development on a dedication of land to offset the development’s effects. This probable future dedication is likewise a fact that would bear on the property’s permissible uses. Under California case law, the fair market value of the dedicated land is therefore based on its undeveloped, agricultural state. (Maj. opn., ante, at p. 599; City of Porterville v. Young (1987) 195 Cal.App.3d 1260, 1265-1269 [241 Cal.Rptr. 349] (Porterville).) This is so, as the majority explains, because the landowner would never have been able to develop the dedicated portion of the property. (Maj. opn., ante, at p. 599.) “[I]f the remainder of the parcel is not developed beyond its present agricultural use, [the] owner will have been paid exactly what the take was worth; if the remainder of the parcel is developed for commercial purposes, [the] owner will have been paid for the land he would have been required to dedicate to [the] city to obtain the *608 building permits or conditional use permit necessary for the commercial development.” (Porterville, at p. 1269.)
Here, a public agency asserts that the strip of land sought for condemnation is the same strip it would have required the property owner to dedicate as a condition of development. The property’s valuation as undeveloped, agricultural land thus depends on (1) whether the hypothetical dedication could lawfully have been imposed, and (2) whether it was reasonably probable the agency would actually have imposed the dedication as a condition of development, even in the absence of the project. (Porterville, supra, 195 Cal.App.3d at pp. 1268-1269 [record showed that the dedication would have been required as a condition of development even if the city had not undertaken its street-widening project]; City of Fresno v. Cloud (1972) 26 Cal.App.3d 113, 119 [102 Cal.Rptr. 874] [trial court erred in excluding evidence of a “high probability” that building permits would not have been issued without the street dedications].) Where those two elements are satisfied, “the most that a willing buyer would pay for the portion subject to the dedication requirement is its value in its undeveloped state.” (Maj. opn., ante, at p. 599.)[1] If, on the other hand, “the owner were compensated based on the highest and best use of the property [as light industrial], the owner would get a windfall—i.e., payment based on developed value for property that could not have been developed under any circumstances.” (Maj. opn., ante, at p. 599; see Contra Costa County Flood Control etc. Dist. v. Lone Tree Investments (1992) 7 Cal.App.4th 930, 935-936 [9 Cal.Rptr.2d 326] [“Lone Tree would receive a windfall if it were to receive commercial value for a strip of land that would never be developed and that a buyer knew could not be developed”].)
Such a payment would not only be a windfall. It would be unconstitutional. (See Redevelopment Agency v. Gilmore (1985) 38 Cal.3d 790, 809 [214 Cal.Rptr. 904, 700 P.2d 794] (conc. opn. of Mosk, J.).) A compensation award that would make the owner better off than if the property were never taken is flatly contrary to the constitutional requirement that just compensation be “just to the public as well as to the landowner.” (Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp., supra, 16 Cal.4th at p. 716; accord, United States v. Commodities Corp. (1950) 339 U.S. 121, 123 [94 L.Ed. 707, 70 S.Ct. 547].)
I therefore part company with the majority to the extent it mandates such a windfall when (in its words) “it was probable at the time the dedication *609 requirement was put in place that the property designated for public use was to be included in the project for which the property is being condemned.” (Maj. opn., ante, at p. 586.) The extra layer of analysis it purports to add to the Porterville inquiry is as difficult to understand as it is to apply. Nor can the majority point to a single authority, in this state or any other jurisdiction, that has applied a ‘“date of probable inclusion” analysis to exclude an entirely lawful, reasonably probable dedication from the determination of just compensation. This omission is particularly striking, given that ‘“every court across the United States that has decided the issue has held that future dedication requirements are admissible” in determining just compensation for the dedicated land. (Herman & Martinez-Esteve, The Admissibility of Dedication Requirements in Condemnation Cases: No Longer the Road Less Traveled (2011) 85 Fla. Bar J. 20, 22, italics added.) Most importantly, the majority fails to explain how the windfall it has now required public agencies to pay to random, lucky property owners can be reconciled with the state Constitution.
What the majority appears to believe is that the project effect rule compels it to exclude evidence of a hypothetical dedication from the valuation of property lawfully subject to a dedication requirement. This rule provides that ‘“[t]he fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to ... [¶] (a) The project for which the property is taken” or “(c) Any preliminary actions of the plaintiff relating to the taking of the property.” (Code Civ. Proc., § 1263.330.) But section 1263.330 is merely a codification of just compensation principles. (See Woolstenhulme, supra, 4 Cal.3d at pp. 496-497; Buena Park School Dist. v. Metrim Corp. (1959) 176 Cal.App.2d 255 [1 Cal.Rptr. 250].) Where, for example, property was initially expected to be attractively close to an artificial lake but was eventually condemned to build the lake, evidence of the project’s effect on the property’s value is inadmissible from the point at which it became reasonably probable that the property would in fact be taken for the project. (Woolstenhulme, at p. 484.) And where property is condemned for a freeway, the valuation of the property should exclude a zoning restriction barring any development on the property that would be inconsistent with the proposed freeway. (City of San Diego v. Rancho Penasquitos Partnership (2003) 105 Cal.App.4th 1013, 1034, 1038-1039 [130 Cal.Rptr.2d 108].)
This case is different. The project effect rule has no application where the agency can show that the dedication on which it relies was lawful and would actually have been imposed, independent of the project. When the agency makes this showing, it has done all it needs to prove that any decrease in the value of the property is “attributable to” the exercise of its lawful police power to compel a dedication—and is therefore not “attributable to” the project for which the property is being condemned or any preliminary actions *610 relating to the taking of the property. (Code Civ. Proc., § 1263.330.) In other words, where the agency could have (and would have) required that the property be dedicated to mitigate the effects of any development, the agency has shown that the dedicated land could never have been developed, even if the agency had not undertaken the project in which it is currently engaged. Nothing in the language or legislative history of the project effect statute indicates an intent to exclude evidence of lawful dedications that mitigate the effects of developing a property and that would have been imposed as a condition of development, independent of any project then being undertaken.
Nor does our case law support the majority’s approach. In State Route 4 Bypass Authority v. Superior Court (2007) 153 Cal.App.4th 1546 [64 Cal.Rptr.3d 286], for example, the joint powers agency formed to facilitate the construction of a new highway instructed its member agencies to condition the grant of any development applications on the dedication of a 110-foot right-of-way “ ‘lying about the centerline of the SR4 Bypass.’ ” (Id. at p. 1551.) A city engineer testified that this dedication requirement was designed to facilitate the project and that, in applying the dedication requirement, he “would not typically take into account any traffic study done in connection with a [particular] development or the nature of the development proposed.” (Id. at p. 1553.) Although there is certainly room to question whether the Court of Appeal correctly determined that the dedication was lawful or reasonably probable in that case, it nonetheless seems plain that the dedication requirement there was put in place after inclusion of the affected properties became probable. (Accord, Department of Transportation v. Lundberg (1992) 312 Or. 568 [825 P.2d 641, 648] [upholding the admission of evidence concerning the city’s dedication requirement on the issue of valuation, even though the dedication was adopted after the city and state had decided on a plan to widen the avenue that served as a state highway, and the dedication was enacted to “implement” the project].)
What the majority also fails to recognize is that its asserted policy justifications for cutting back on Porterville, supra, 195 Cal.App.3d 1260, have already been addressed—in Porterville itself. To resolve whether it is “reasonably probable” that a public agency would actually have imposed the dedication as a condition of development even in the absence of the project, the trier of fact may indeed consider whether the dedication requirement is a “standard” one that has been “imposed on multiple, similarly situated properties.” (Maj. opn., ante, at p. 604.) The fact finder may also consider whether there has been only “a short period between the time the property is designated for public use and the time the agency first signals its intention to condemn the property” (id. at p. 605), to the extent the closeness in time casts doubt on the likelihood the public agency would actually have imposed the dedication as a condition of development. How much weight to accord these facts is properly reserved to the trier of fact.
*611 Instead, the majority’s approach is likely to generate mischievous effects— and not only for the trier of fact. The majority’s reliance on the concept of an agency’s “original expectation,” or what a public agency “originally contemplated” (maj. opn., ante, at p. 602) represents a substantial retreat from the well-settled rule that “[t]he proper inquiry is not into the subjective motive of the government agency”—an inquiry that would violate “the principle that courts do not delve into the individual purposes of decisionmakers in a quasi-adjudicative proceeding”—hut (rather) whether the agency’s findings are based on substantial evidence. (Landgate, Inc. v. California Coastal Com. (1998) 17 Cal.4th 1006, 1022 [73 Cal.Rptr.2d 841, 953 P.2d 1188]; see maj. opn., ante, at p. 592, quoting Landgate.) Courts avoid such investigation into the subjective mental states of public decision makers for good reason. Because public agencies rarely if ever operate entirely as unitary actors, it is far from obvious what it means to divine their “intent” in this context. The majority’s approach may also encourage or even force public agencies to postpone planning related to a project until a dedication requirement has already been established, which would unduly and unnecessarily hamper the planning process. (See Klopping v. City of Whittier (1972) 8 Cal.3d 39, 45, fn. 1 [104 Cal.Rptr. 1, 500 P.2d 1345].) indeed, to say that a public agency can exact a lawful and reasonably probable dedication valued as undeveloped land only when the ultimate use of the dedicated property is unknown or unforeseeable all but encourages agencies to engage in willful blindness, by pitting good planning against a fair price for the property.
Finally, the majority leaves unanswered a panoply of questions about how its new rule is supposed to be applied and what effects it will have. For example:
A public project typically has multiple justifications, and a dedication may be sought to offset myriad effects from development. Must the dedication be excluded from valuation, even though it was lawful and would have been imposed as a condition of development, when the agency is unable to show that the dedication was “contingent on” development of adjacent property (maj. opn., ante, at p. 602) or is otherwise unable to exclude the possibility that the dedication might also serve valid public purposes unrelated to development of the property?
The majority puts determinative weight on the date the dedication requirement was put in place. Does the majority’s approach effectively nullify ad hoc dedication requirements?
Will identical dedications on identical types of property trigger different levels of compensation, depending on what the agency originally contemplated or how far along the project is? When a dedication is lawfully made a *612 condition of development, but the property is probably included in a project, must the property owners who have submitted applications to develop their property be paid for the dedication—a dedication the government would otherwise have obtained “for free” (maj. opn., ante, at p. 599)? And how should buyers and sellers in the market value a potential dedication when the value of that dedication will be determined entirely on the relative timing of the imposition of a dedication requirement and the commencement of the project for which the dedication is sought?
These questions are crucial under our law, but they are not ones the project effect rule is capable of answering. The project effect rule, as interpreted in our case law, ensures only that the condemned property’s valuation is not distorted by a public agency’s preparations for the project, or by the project itself. But where a strip of the property in question would lawfully have been taken to offset the impact of developing the rest of the parcel—even if the project never existed—then the probable future dedication is neither a “project” nor preliminary actions “relating” to the project within the meaning of section 1263.330 of the Code of Civil Procedure. That the majority fully agrees with this proposition (see maj. opn., ante, at p. 603 [“Nothing in the language or legislative history of subdivision (a) indicates an intent to cover steps taken by a public agency to mitigate the impact of development, independent of any project”]) makes its apparent retrenchment from Porterville all the more difficult to understand.
Under the approach I endorse, by contrast, the task for the trial court on remand would remain straightforward—sensitive to the realities of the planning process, and in accordance with established law. Quite simply: Does the dedication satisfy Porterville! To answer that question, the trial court would consider whether requiring the owners to dedicate a middle strip comprising almost 20 percent of their property would have an essential nexus to the valid public purpose that would be served by denying the permit, and whether the dedication would be roughly proportional to the impact of any future development. (See Rohn v. City of Visalia (1989) 214 Cal.App.3d 1463 [263 Cal.Rptr. 319] [a dedication constituting 14 percent of the property, which would be used to realign a city street, was an improper condition under Nollan, supra, 483 U.S. 825, on the owner’s application to convert a residence to an office building].) If so, a jury would determine whether it was reasonably probable the city, even in the absence of the project, would have required a dedication of this scope. If the city fails to satisfy either element of Porterville, then the city’s condemnation of the strip can fairly be characterized as part of the Indian Avenue project, and the purported dedication requirement, under the project effect rule, should be excluded from the jury’s valuation of the property.
*613 So I concur with the majority that the first prong of the Porterville inquiry is a question for a court, not a jury. But otherwise, I respectfully dissent.
*614 APPENDIX

 Some jurisdictions go so far as to deny compensation altogether for the dedicated land, even when the owner has not yet sought to develop the property. (See State v. Sturmfels Farm Ltd. Partnership (Mo.Ct.App. 1990) 795 S.W.2d 581, 587 [where the dedication requirement would have been constitutional and was reasonably likely to have been imposed, landowners suffer “no compensable loss”].)